UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JOHNNY M. ESPARZA,                      )
                                        )
        Plaintiff,                      )
                                        )
v.                                      )    Case No. 4:18-cv–00782-SEP
                                        )
DIANE MANLEY, et al.,                   )
                                        )
        Defendants.                     )

## MEMORANDUM AND ORDER

Before the Court is Defendants' Motion for Summary Judgment.  Doc. [52].  The Motion
has been fully briefed.  For the reasons set forth below, the Motion is granted as to Defendants
Driskell, Manley, Bouse, "Monty," "K," and denied as to Defendant Crawford County.

### FACTS AND BACKGROUND

Plaintiff Johnny Esparza initiated this action on May 18, 2018.  Doc. [1].  On February
15, 2019, Plaintiff filed a Second Amended Complaint, naming as Defendants, Crawford County
Sheriff's Department and five individuals:  Zackary Driskell, Diane Manley, Derek Bouse, and
two unknown individuals whom Plaintiff refers to as "Monty" and "K."  Doc. [27].  On
September 24, 2019, the Court dismissed all claims against Defendants in their official
capacities, as well as Plaintiff's Failure to Protect and Failure to Supervise claims.  Doc. [42].
Plaintiff now has three remaining claims.  Count I alleges that Defendants violated his rights
under the ADA.  Doc. [27] at 9.  Count II alleges that Defendants violated his Fourteenth
Amendment right to treatment for a serious medical need.  *Id.* at 10.  Count III alleges that
Defendants retaliated against him for exercising his First Amendment right to free speech.  *Id.* at
11.

In 2014, Plaintiff had a total laryngectomy to treat Stage IV cancer, which resulted in a
visible hole (or "stoma") in his throat.  Doc. [65] (Plaintiff's Statement of Additional Material
Facts) ¶¶ 1, 4.  Plaintiff alleges that, as a result of the procedure, he can no longer speak

naturally.[1]  *Id.* ¶¶ 1, 3.  After the surgery, Plaintiff contends that his surgeon prescribed him an electrolarynx—a device which, when placed to Plaintiff's throat, allows him to speak.  *Id.* ¶ 2.  The electrolarynx is assembled from multiple smaller parts and is powered through the use of a detachable, rechargeable battery.  Doc. [64] ¶ 24.  Plaintiff alleges that he cannot verbally communicate without the electrolarynx, although he can write, mouth words, and use hand signals as alternatives.  Doc. [65] ¶ 3.  In addition to the communication issues caused by the laryngectomy, Plaintiff alleges that his stoma, which is used to help him breathe and speak when he uses the electrolarynx, must be kept clean and humid to prevent it from crusting over.  *Id.* at 4.

---

[1] Although Defendants do not dispute that Plaintiff had a laryngectomy, Doc. [54] ¶ 2, Defendants dispute whether Plaintiff is "disabled" as a result of the procedure, whether his surgeon prescribed him an electrolarynx, and whether the use of his electrolarynx is necessary for him to speak.  Doc. [70] (Defendants' Response to Plaintiff's Statement of Additional Material Facts) ¶¶ 1-4.  Plaintiff alleges that he is disabled and requires his device to communicate orally.  *Id.*; Doc. [63] at 12-13 (citing 42 U.S.C. § 12102(1)(A)) (arguing that Plaintiff is "disabled" within the meaning of the ADA because he suffers a "physical . . . impairment that substantially limits one or more major life activities . . .").  He maintains that, without his functioning and properly charged electrolarynx, he could not communicate with individuals outside the Detention Center via phone, Doc. [70] ¶ 23, or with his mother and child during visits, *id.* ¶ 19, or with medical staff when necessary, *id.* ¶ 20; Doc. [65-3] Ex. B ¶¶ 23-24.  Plaintiff further alleges that, in the absence of his working device, he relied on his ability to mouth words or use hand gestures to communicate with other inmates who could speak to prison staff on his behalf.  Doc. [70] ¶ 22.  He also claims to have used faxes as a means of communication but that he was frequently unable to do so because the faxes were "too thick" or exceeded the maximum file size.  *Id.* ¶¶ 13, 26, 27.  Defendants dispute those allegations and contend that Plaintiff could successfully communicate orally, among other ways, "when it suit[ed] him."  Doc. [53] at 11.  They contend that Plaintiff himself has noted that he engaged in oral communications on many occasions when he did not have access to his device, and that he took advantage of writing tools at the Detention Center, as evidenced by his frequent use of the grievance system.  *Id.* at 10-11.

The parties' conflicting accounts, and the evidence therefor, are sufficient to create a genuine dispute of material fact as to Plaintiff's ability to communicate, as a reasonable jury could infer from the evidence that Plaintiff was unable to communicate orally without his device and that he did not have meaningful access to alternative methods of communication.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court also acknowledges that Plaintiff cites affidavits by Dr. Allan Allphin, the surgeon who performed his laryngectomy, and Sean Pluta, his attorney, to support his contention that he cannot communicate orally without his electrolarynx.  *See* Docs. [63] (Plaintiff's Memorandum in Opposition of Defendants' Motion for Summary Judgment); [70].  Defendants object to the use of those affidavits on the grounds that the declarants were not properly disclosed as experts in Plaintiff's Rule 26 disclosures.  Doc. [70] ¶¶ 1-4, 33-36.  Given the wealth of other evidence, the Court finds it unnecessary to rely on the affidavits of Dr. Allphin and Mr. Pluta in concluding that there is a genuine dispute of material fact as to Plaintiff's ability to communicate at the Detention Center.  As a result, the Court declines to decide the merits of the parties' discovery dispute as referenced in their sur-reply motions, Docs. [72], [75], and [76].  To the extent that Plaintiff relies on the contested affidavits in his memoranda, statements of fact, and exhibits opposing this Motion, the Court will disregard such references.

Plaintiff was incarcerated as a pre-trial detainee at the Crawford County Detention Center on January 11, 2018, in connection with a warrant for his arrest.  Doc. [64] (Plaintiff's Response to Defendants' Statement of Material Facts) ¶ 1; Doc. [52] (Defendants' Motion for Summary Judgment) ¶ 1.  When Plaintiff arrived at the Detention Center, he had his electrolarynx in his possession.  Doc. [70] (Defendant's Response to Plaintiff's Statement of Additional Facts) ¶ 6.  Believing that Plaintiff's electrolarynx could be used as a weapon,[2] Defendants initially placed him in a single-person cell under administrative segregation.  *Id.*  After Plaintiff's initial separation, Defendants gave him two choices:  remain in administrative segregation and keep his electrolarynx or enter the general population without the device.[3]  *Id.* ¶ 7.  Plaintiff agreed to move to the general population and was transferred there on January 20, 2018.  *Id.* ¶ 11.  Plaintiff alleges that, prior to the move, he instructed Defendants on how to properly charge his electrolarynx for future use; Defendants deny that such a conversation occurred.  *Id.* ¶ 10.  During his time in the general population, Plaintiff alleges that he was not provided with additional free materials or accommodations in place of the electrolarynx.  *Id.* ¶ 11.

On January 22, 2018, Plaintiff filed a Level I Grievance Form requesting possession and use of the electrolarynx in the general population.[4]  Docs. [64] ¶ 30; [70] ¶ 12.  In his request,[5] Plaintiff described his frustration with his lack of access to the electrolarynx or, alternatively, a

---

[2] Specifically, Defendants claim that they were concerned that the smaller parts of the electrolarynx could be disassembled and fashioned into weapons.  Doc. [64] ¶ 25.  Additionally, Defendants feared that the rechargeable battery could be used to start a fire or be used as a weapon.  *Id.*

[3] The parties dispute the extent to which Plaintiff was aware that he would have limited access to his electrolarynx during his time in the general population.  Plaintiff alleges that he was told that he would be without the device for only a short period of time and expected that, at some point, the device would be returned to him for full-time use in the general population.  *See* Doc. [70] ¶¶ 7, 9; Doc. [64] ¶ 28.  Defendants claim, to the contrary, that Plaintiff was informed that, if he chose to remain in the general population, he would have access to the electrolarynx only in certain limited situations such as court appearances, visitations, and medical visits.  Doc. [70] ¶ 7.

[4] Plaintiff alleges that he noted in his request that Defendants, by depriving him of both his electrolarynx and access to writing materials, were denying him proper medical care. he believed he was being denied proper medical care.  Doc. [70] ¶ 12.  Defendants, however, contend that Plaintiff's request (as well as his other various requests throughout his detention) focused on having *unlimited* access to the electrolarynx while still being housed in the general population.  *Id.*

[5] Defendants characterize Plaintiff's January 22, 2018, complaint as a request, noting that it was not a formal Level I Grievance.  Defendants' assertion is confusing, however, considering Plaintiff's complaint is submitted on a form entitled "Prisoner's Grievance Form" and his notes are found under the "Level I Grievance" section.  Doc. [65-6] Ex. B3 at 2.  Nevertheless, whether Plaintiff's January 22, 2018, communication was considered a Level I Grievance is immaterial to the determination of this Motion.

pen and paper.  Docs. [70] ¶ 12; [65-6] Ex. B3 (Plaintiff's Jan. 22, 2018, Level 1 Grievance).  In part, Plaintiff's complaints centered around feeling unsafe, because he was unable to "yell or write for help" in the general population.  Doc. [70] ¶ 12.  Plaintiff's request was denied the same day, and Defendants told him that he may choose to return to administrative segregation if he did not feel safe in the general population.  *Id.*; Doc. [64] ¶ 30.  Defendants assert that Plaintiff did not appeal the January 22, 2018, decision.[6]  Doc. [70] ¶ 14.

After Plaintiff's initial complaint, throughout January and February 2018, he began repeatedly filing grievances complaining about his lack of access to his electrolarynx or other means of communication, both in the general population and at other times when he expected to have access to the device.  *Id.* ¶ 13; Doc. [65-3] Ex. B ¶ 15.  Additionally, Plaintiff complained about the way Defendants treated him and his frustration with the grievance process.  Doc. [70] ¶¶ 13-15.  Specifically, in his various grievances, Plaintiff made the following accusations:  that he was unable to communicate with his visitors because he lacked access to his electrolarynx or an alternative means of communication;[7] that Defendants "continually refused" to charge his device properly when it was in their possession, Doc. [64] ¶ 32;[8] that the commissary computer

---

[6] The Detention Center has a specific grievance procedure that inmates are expected to follow to adjudicate disputes.  Doc. [64] ¶¶ 3-5.  Plaintiff does not dispute that he was aware of the procedures outlined in the Inmate Handbook, but he alleges that, while he knew how to file a Level I Grievance, he was not familiar with the appeals process or the legal ramifications of failing to follow the procedures.  *Id.* ¶¶ 6-7.  The grievance process involves three mandatory steps: a Level I Grievance, a Level II Grievance, and a Level III Administrative Remedy.  *Id.* ¶ 9.  At each stage, an inmate must fill out the required form, to which a designated employee of the Detention Center must reply.  *See id.* ¶¶ 10-21.  When each decision is returned to the inmate, he or she has the opportunity to reject the previous decision and to initiate an appeal within 72 hours of the notice.  *See id.*  If the process reaches Level III, a copy of the decision is given to the Crawford County Sheriff.  *Id.* ¶ 19.  An inmate may also appeal any Level III decision to the Sheriff directly, who then must respond to that appeal.  *Id.* ¶ 20.

[7] For purposes of this allegation, Plaintiff admits that he received visitors three times during his time at the Detention Center, but that he "has no recollection that he was able to speak to his mother and son" on at least two of the three visitations.  Doc. [64] ¶ 34.

[8] Defendants maintain that they followed Plaintiff's instructions for charging the device and did not intentionally refuse to charge the batteries.  Doc. [64] ¶ 38 (noting Defendant Manley's response to Plaintiff that the batteries for his device "were on the charger"); *see* Doc. [69] at 6-7.  In addition to Defendants' contentions, two officers who are not defendants in this litigation, notified Plaintiff that his electrolarynx battery "has been left plugged in" when it has not been in use.  Doc. [64] ¶¶ 43-44.  Despite this, however, Plaintiff contends that Defendants did not charge the battery in an acceptable manner because it failed to work on multiple occasions, which he asserts would only have occurred if the battery was not being properly charged.  Doc. [70] ¶ 19 ("Defendants either failed to charge his electrolarynx, or failed to do it properly").

was broken, so he could not purchase envelopes to send correspondence, *id.*; that his serious medical needs were ignored, *id.* ¶ 35; that he was denied access to pens and paper as an alternative method of communication, *id.*; that Defendant Manley was "losing" faxes that he used to communicate with his attorney, *id.* ¶ 37; that he felt unsafe in the general population without his electrolarynx, *id.* ¶¶ 35, 38, 39; and that it was inappropriate for Defendant Manley to review grievances that were related to her own conduct, Doc. [70] ¶ 15 (citing [65-3] (Esparza Declaration) ¶ 17). Various Defendants and other Detention Center staff—most frequently, Defendant Manley—responded to Plaintiff's grievances, which were all denied. *See* Doc. [64] ¶¶ 33-40.

On February 16, 2018, Plaintiff attempted to correspond directly with the Crawford County Sheriff, Darin Layman, to complain of an incident that occurred on or around that day involving a visit he had with the Detention Center nurse. *Id.* ¶ 42. Sheriff Layman did not respond to Plaintiff's complaint. *Id.* Plaintiff alleges that, during the visit, he was unable to communicate with the nurse because he did not have access to his device or any other materials to communicate with. Doc. [65-3] Ex. B ¶ 23. According to Plaintiff, that made him "visibly frustrated and upset," for which he wrote to Defendant Wright to apologize. *Id.* ¶¶ 23-24. In response to his apology, Plaintiff claims that Defendant Wright noted that he "wished there was more [he] could do" for him. *Id.* ¶ 24.

On the same day, Sergeant Hanner, a non-party, entered a note on Plaintiff's inmate file, noting that Plaintiff filed a complaint stating that he was being denied access to medicine and was unable to clean his stoma without the proper equipment. Doc. [64] ¶ 44. Hanner's note mentioned that he spoke to the nurse, who said that Plaintiff declined medication at first because it was too expensive, and that Plaintiff also stated that he did not need any equipment to clean the stoma so long as he had access to a hot shower. *Id.*

Despite filing various Level I Grievances, Plaintiff did not initiate the proper appeals process for any of his complaints. *See* Docs. [53] at 5-6; [63] at 3. Plaintiff nevertheless contends that several of his communications were attempts to appeal the denials of his initial complaints.[9] Doc. [65-3] ¶ 17 ("I also tried to appeal in other ways."). Those attempts are

---

[9] Defendants claim that Plaintiff did not indicate an attempt to appeal on any of the forms he submitted. They point to one communication in which Plaintiff writes, "this is not an appeal . . . are you kidding me," Doc. [70] ¶ 14 (citing Doc. [64-14] Ex. B7), but in the same grievance Plaintiff checks the box

evidenced, according to Plaintiff, by his comments on various grievances that were returned to him.  Doc. [70] ¶ 15.  For instance, on an original form that was returned to him, Plaintiff wrote that Defendants never "addressed this issue" and that he was given no responses to his previous grievances.  Doc. [64] ¶ 41.  Additionally, Plaintiff points to a complaint he made about Defendant Manley impermissibly reviewing grievances of which she was the subject.  *See* Doc. [65-3] Ex. B ¶ 17 (citing Ex. B5).  Plaintiff also alleges that he attempted to appeal the determinations in other ways.  Doc. [65] ¶ 15.  Finally, Plaintiff notes that the letter addressed to Sheriff Layman was an attempt to appeal the conditions that he complained about in his various grievances.  *Id.*

Despite Plaintiff's attempts to challenge Defendants' decisions, he remained in the general population without his device and without free access to pen or paper.  Doc. [70] ¶ 22.  Besides the communication issues described in his grievances, Plaintiff alleges that he suffered additional mistreatment due to his disability.  For example, he claims that he was unable to use his electrolarynx at a court proceeding on February 21, 2018, *id.* ¶ 21; that he had to resort to mouthing words or making hand gestures to non-disabled inmates in an effort to have them speak on his behalf, *id.* ¶ 22; and that he could not make phone calls because of the charging issue with his electrolarynx and was not allowed to access "indigent envelopes" to make up for the inability to speak on the phone, *id.* ¶¶ 23-24.

Finally, in addition to Plaintiff's complaints related to his inability to communicate, he alleges that he was harassed by Defendants—Defendant Manley in particular—because of his disability and his criticism of the conditions of the Detention Center.  Plaintiff claims that Defendant Manley "jokingly" told Plaintiff not to yell at her, which he perceived as her taunting him for his inability to yell.  *Id.* ¶ 25.  He contends that Defendants denied him access to his electrolarynx and other alternative communication devices to punish him for his frequent use of the grievance system.  *Id.* ¶ 28.  And he claims that Defendants denied him access to communication devices because they did not want him to be able to speak because he "was so critical" about his lack of access to his device and black mold that was allegedly within the Detention Center.  *Id.*

---

indicating that he wishes to appeal the decision against him, Doc. [64-14] Ex. B7.  Given such equivocal evidence, the Court finds that there is a genuine dispute of material fact as to whether Plaintiff attempted to appeal Defendants' decisions.  *See Anderson*, 477 U.S. at 248.

Plaintiff was released from the Detention Center on February 22, 2018, and was given his electrolarynx back. *Id.* ¶ 30. After his release, Plaintiff brought this suit alleging that Defendants violated his rights under the ADA, the Fourteenth Amendment, and the First Amendment. *See* Doc. [27] at 1-2.

### LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court must grant summary judgment if it finds, based on the factual record, that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Material facts are those that "might affect the outcome of the suit under the governing law," and there is a genuine dispute where "a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323 (quotation marks omitted). The burden then shifts to the non-movant to "present specific evidence, beyond 'mere denials or allegations [that] . . . raise a genuine issue for trial.'" *Farver v. McCarthy*, 931 F.3d 808, 811 (8th Cir. 2019) (quoting *Wingate v. Gage Cty. Sch. Dist., No. 34*, 528 F.3d 1074, 1079 (8th Cir. 2008)).

Motions for summary judgment in qualified immunity cases are "unique in that the court should not deny summary judgment any time a material issue of fact remains on the constitutional violation claim . . . ." *Jones v. McNeese*, 675 F.3d 1158 (8th Cir. 2012) (cleaned up) (quoting *Brockinton v. City of Sherwood, Ark.*, 503 F.3d 667, 671 (8th Cir. 2007)). Because qualified immunity "is an immunity from suit rather than a mere defense to liability[,] . . . it is effectively lost if a case is erroneously permitted to go to trial." *Id.* (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). Therefore, in a qualified immunity case, the court must "take a careful look at the record, determine which facts are genuinely disputed, and then view those facts in a light most favorable to the non-moving party so long as those facts are not so blatantly contradicted by the record that no reasonable jury could believe them." *Id.* (cleaned up) (quoting *O'Neil v. City of Iowa City, Iowa*, 496 F.3d 915, 917 (8th Cir. 2007)).

7

DISCUSSION

**I.    Plaintiff's Claims Against Defendants Driskell, Manley, Bouse, "Monty," and "K"**

**A.    Plaintiff's ADA claim is not subject to the PLRA's exhaustion requirement.**

The Prison Litigation Reform Act (PLRA) provides in relevant part that "no action shall be brought [under federal law] with respect to prison conditions . . . by a prisoner . . . until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a); *Jones v. Block*, 549 U.S. 199, 211 (2007).  Section 1997e(a) "requires that inmates exhaust prison grievance procedures before bringing § 1983 suits related to prison conditions."  *Burns v. Eaton*, 752 F.3d 1136, 1141 (8th Cir. 2014).  The PLRA's exhaustion requirement applies to ADA claims as well as § 1983 claims.  *See C.P.X. through S.P.X. v. Garcia*, 450 F. Supp. 3d 854, 900 (S.D. Iowa 2020) (citing *Porter v. Sturm*, 781 F.3d 448, 451 (8th Cir. 2015); *Jackson v. Fed. Bureau of Prisons*, 2007 WL 843839, at *19 (D. Minn. Mar. 16, 2007)) (applying the PLRA's exhaustion requirement to a plaintiff's ADA claim).

Defendants argue that Plaintiff failed to exhaust his administrative remedies by following the Detention Center's three-level grievance process.  Doc. [53] at 3-5.  Plaintiff responds that exhaustion of administrative remedies would have been futile.[10]  Doc. [63] at 8.  The Court takes no position on whether Plaintiff sufficiently exhausted his administrative remedies, because "the PLRA's exhaustion requirement only applies to 'person[s] incarcerated or detained,'" *Nerness v. Johnson*, 401 F.3d 874, 876 (8th Cir. 2005) (quoting 42 U.S.C. § 1997e(h)), and Plaintiff was not incarcerated or detained at the time of filing.  *See* Doc. [1]; Doc. [70] ¶ 30.  Therefore, he was not subject to the PLRA's exhaustion requirement.[11]  *See Nerness*, 401 F.3d at 876.

**B.  Plaintiff cannot maintain an ADA claim against Defendants in their individual capacities.**

The Eighth Circuit has held that actions against public actors in their individual capacities may not be maintained under Title II of the ADA.  *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1005 n.8 (8th Cir. 1999).  The Crawford County Detention Center is a "public entity" within the

---

[10] Plaintiff bases his futility claim, in part, on the Supreme Court's decision in *Houghton v. Shafer*, 392 U.S. 639 (1968)*,* which Defendants argue was overruled by *Woodford v. Ngo*, 548 U.S. 81 (2006).  *See* Docs. [69] at 3; [71]–[76].  Because the Court does not rely on *Houghton* in deciding the merits of this Motion, it declines to take a position on that question.

[11] It is irrelevant that Plaintiff failed to make this argument in his Memorandum in Opposition to Defendants' Motion for Summary Judgment.  Exhaustion is an affirmative defense for which Defendants bear the burden of proof.  *Foulk v. Charrier*, 262 F.3d 687, 697 (8th Cir. 2001).

meaning of the ADA, but its individual employees are not. *Id.* As such, claims against them in their individual capacities are not permitted under the ADA, and the individual Defendants are entitled to judgment as a matter of law with respect to that claim.

### C. Individual Defendants are entitled to qualified immunity from Plaintiff's constitutional claims.

Section 1983 of Title 42 of the United States Code provides in relevant part:

> Every person who, under the color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law.

42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights," but affords "a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)). Thus, in considering a § 1983 claim, a court must "identify the specific constitutional right allegedly infringed." *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 394 (1989)).

"Qualified immunity shields government officials from liability in a § 1983 action unless their conduct violates a clearly established right of which a reasonable official would have known." *Burnikel v. Fong*, 886 F.3d 706, 709 (8th Cir. 2018) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Thus, a "qualified immunity analysis requires a two-step inquiry: (1) whether the facts shown by the plaintiffs make out a violation of a constitutional or statutory right, and (2) whether the right was clearly established at the time of the defendant's alleged misconduct." *Morgan v. Robinson*, 920 F.3d 521, 523 (8th Cir. 2019) (en banc) (quoting *Nord v. Walsh Cnty.*, 757 F.3d 734, 738 (8th Cir. 2014)). "Unless both of these questions are answered affirmatively, [a defendant] is entitled to qualified immunity." *Id.* at 523 (quoting *Nord*, 757 F.3d at 738).

Although "[q]ualified immunity is an affirmative defense for which the defendant carries the burden of proof," the "plaintiff . . . must demonstrate that the law is clearly established." *Sparr v. Ward*, 306 F.3d 589, 593 (8th Cir. 2002) (citing *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1048 (8th Cir. 1989)). "A right is clearly established only where it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7 (2021) (per curiam) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam). Although case law directly on point is not necessary to demonstrate that a right is clearly established, "existing precedent must have placed the statutory

or constitutional question beyond debate." *Id.* (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017)).  The Supreme Court has reiterated in recent decisions that clearly established rights "should not be defined at a high level of generality."  *White*, 137 S. Ct. at 552 (quotation marks omitted) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).  Qualified immunity exists to protect "all but the plainly incompetent or those who knowingly violate the law."  *Id.* at 551 (quoting *Mullenix,* 577 U.S. at 12).

Plaintiff alleges that his constitutional rights were violated by the individual Defendants because they:  (1) acted with deliberate indifference to his serious medical needs in violation of the Fourteenth Amendment and (2) retaliated against him in violation of his First Amendment rights.  The Court will address each alleged constitutional violation in turn.

### i.  Individual Defendants are entitled to qualified immunity from Plaintiff's Fourteenth Amendment claim.

In his Complaint, Plaintiff alleges that the individual Defendants "deprived [him] of his Fourteenth Amendment right to treatment for a serious medical need."  Doc. [27] ¶ 65.  Because Plaintiff was a pretrial detainee at the Detention Center, his "right to medical care arises under the Due Process Clause of the Fourteenth Amendment."  *Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014) (citing *Vaughn v. Greene Cnty.*, 438 F.3d 845, 850 (8th Cir. 2006)). Although Plaintiff's claim is rooted in the Fourteenth Amendment, a pretrial detainee is "entitled to at least as much protection under the Fourteenth Amendment as under the Eighth Amendment."  *Kitchen v. Miller*, 343 F. Supp. 2d 820, 823 (E.D. Mo. 2004) (quoting *Hartsfield v. Colburn*, 371 F.3d 454, 457 (8th Cir. 2004)).  Therefore, the Court applies the deliberate indifference standard for an Eighth Amendment violation to Plaintiff's claim.  *Id.*

"Deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment."  *Holden v. Hirner*, 663 F.3d 336, 342 (8th Cir. 2011) (quoting *McRaven v. Sanders*, 557 F.3d 974, 979 (8th Cir. 2009)). A deliberate indifference claim "has both an objective and a subjective component."  *McRaven*, 577 F.3d at 980 (quoting *Vaughn v. Gray*, 557 F.3d 904, 908 (8th Cir. 2009)).  "The objective component requires a plaintiff to demonstrate an objectively serious medical need"; "the subjective component requires a plaintiff to show that the defendant actually knew of, but deliberately disregarded, such need."  *Id.* (quoting *Vaughn*, 557 F.3d at 908).

"A serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Holden*, 663 F.3d at 342 (quoting *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997)). The subjective component—whether a defendant was deliberately indifferent to a serious medical need—requires more than mere negligence. Rather, it requires a state of mind similar to criminal recklessness. *Nur v. Olmsted Cnty.*, 2021 WL 4444813, at *13 (D. Minn. Sept. 28, 2021) (quoting *Barton v. Taber*, 820 F.3d 958, 965 (8th Cir. 2016)). "Such a mental state can be inferred from facts that demonstrate the response to the medical care was obviously inadequate" or by showing that a defendant "intentionally den[ied] or delay[ed] access to medical care or intentionally interfere[d] with prescribed treatment . . . ." *Id*. (citing *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976)).

Defendants are entitled to summary judgment based on qualified immunity from Plaintiff's Fourteenth Amendment claim as a matter of law unless Plaintiff produces sufficient evidence to enable a reasonable factfinder to conclude that (1) Defendants' conduct amounted to deliberate indifference to Plaintiff's serious medical need in violation of the Fourteenth Amendment, *and* (2) that a reasonable person in Defendants' situation would have known, at the time of the alleged conduct, that it amounted to deliberate indifference to a serious medical need in violation of the Fourteenth Amendment. *See Morgan*, 920 F.3d at 523. Viewing the factual record in the light most favorable to Plaintiff, he has not made that showing.

Defendants focus on the latter prong of the qualified immunity analysis, arguing that they are entitled to qualified immunity because "there is no precedent that established that Plaintiff had a constitutional right to unrestricted possession and use of the electrolarynx while housed in the general population" of the Detention Center, Doc. [53] at 15-16, and noting that Plaintiff cites no such precedent, Doc. [69] at 9. *See Sparr*, 306 F.3d at 593 (plaintiff has the burden of showing that a law is clearly established); *see Fields v. Abbott*, 652 F.2d 886, 890 (8th Cir. 2011) (quoting *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)) ("[Courts] have the discretion to decide 'which of the two prongs of the qualified immunity should be addressed first in light of the circumstances in the particular case at hand.'").

Plaintiff counters that argument by claiming that the alleged constitutional violation is broader than denial of access to his electrolarynx while housed in the general population. Doc. [63] at 19. He states that "any reasonable officer should understand that total deprivation of an

11

auxiliary device *or other reasonable accommodation*" under the circumstances of this case "offended . . . the Fourteenth Amendment . . . ." *Id.* at 21 (emphasis added).  Even assuming Plaintiff's characterization of the alleged constitutional violation, he has not produced sufficient evidence to defeat qualified immunity.

Plaintiff points to ADA case law and regulations, arguing that they should have put Defendants on notice both of his disability status and that their proffered accommodations were "unlawful." *Id.* at 19.  Again assuming *arguendo* that Plaintiff is correct—i.e., that federal ADA regulations do clearly establish that Plaintiff is disabled and that he was statutorily entitled to his device or a different accommodation at the Detention Center—Plaintiff still points to no authority that would have made it clear to reasonable officers in Defendants' situation that failure to provide access to either the electrolarynx or the measures that Plaintiff contends would have been reasonable accommodations in his particular case (e.g., pen and paper at no cost) would constitute deliberate indifference to a serious medical need in violation of his Fourteenth Amendment rights.  In fact, Plaintiff points to no caselaw holding that *any* failure to provide an accommodation for an ADA-recognized disability amounts to violation of a detainee's Fourteenth Amendment rights, much less a case with facts that resemble this one.  *See* Doc. [63] at 19-20.  That lack of precedent makes it very hard to conclude that "existing precedent [has] placed the statutory or constitutional question beyond debate."  *Mullenix*, 577 U.S. at 12 (quoting *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011)).

The Supreme Court has admonished "that 'clearly established law' should not be defined 'at a high level of generality.'" *White*, 137 S. Ct. at 552 (quoting *Ashcroft*, 563 U.S. at 742). Elsewhere in his Opposition, Plaintiff emphasizes that ADA regulations "require a flexible approach" to "auxiliary aids," "and state that the public entity **shall** furnish 'auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place.'" Doc. [63] at 14 (quoting 28 CFR § 35.160(b)(2)).  Given the ADA's context-specific, flexible norms, the fact that Plaintiff is disabled and entitled to reasonable accommodations under the ADA *generally* would not have been sufficient to put reasonable officers in Defendants' position on notice that the *specific* deprivations alleged in this case amounted to deliberate indifference to Plaintiff's

serious medical need in violation of the Fourteenth Amendment.  Thus, Plaintiff has not met his burden to show that the allegedly violated law was clearly established.

Plaintiff also suggests that some of the Defendants' comments regarding his condition and lack of access to his electrolarynx demonstrate that Defendants were aware that their actions were violating his Fourteenth Amendment rights.  Specifically, Plaintiff alleges that Defendant Manley mocked his inability to yell, demonstrating awareness that she was depriving Plaintiff of an accommodation.  Doc. [63] at 19-20.  Plaintiff also highlights Defendant Wright's alleged acknowledgement that the nurse "should have had you write down your answers to her questions" and that he "wish[ed] there was more [he] could do for" Plaintiff.  *Id.* (citing Doc. [65-18] Ex. B11).  Construing the evidence in the light most favorable to Plaintiff, he has not demonstrated that those comments indicate that his right to alternative accommodations was clearly established under the Fourteenth Amendment.

Finally, Plaintiff relies on the recent Supreme Court case, *Taylor v. Riojas*, 141 S. Ct. 52 (2020), for the proposition that his alleged deprivation was so constitutionally suspect that any reasonable officer would have realized Defendants' actions violated the Constitution.  In *Taylor*, the Supreme Court found that an inmate's constitutional rights were violated where he was held in a feces-covered holding cell in extreme temperatures despite the lack of specific precedent addressing such circumstances.  *Id.* at 53-54.  Plaintiff relies on that holding now to suggest that, even without a similar precedent, the Court may find that Plaintiff's rights were violated.

As Plaintiff acknowledges, the facts involved in *Taylor* were extreme.  Doc. [63] at 20. Taking all of Plaintiff's allegations in this case to be true, his treatment was not so outrageous that, without precedent, it would have been obvious to reasonable officers that their actions were unconstitutional.  There is uncontested evidence in the record that Plaintiff had the option of moving to administrative segregation to access his device in administrative segregation, Doc. [70] ¶ 7, Doc. [65-3] ¶ 20; that he had access to sufficient methods of communication to participate in the prison grievance process, Doc. [70] ¶¶ 12-15, Doc. [65-3] ¶ 20; and that he was able to purchase writing materials, Doc. [64] ¶ 36.  Defendants have also submitted evidence that they charged his device when it was not in use. Doc. [52-2] (Defendant Driskill's Affidavit) ¶ 23;

Doc. [52-3] ¶ 21 (Defendant Manley's Affidavit).[12]  While Plaintiff was not afforded access to free pens and paper, Doc. [70] at ¶ 22, Defendants have submitted evidence showing that Plaintiff did not suffer a complete deprivation of his ability to communicate while at the Detention Center.  *See e.g.*, Docs. [70] ¶ 3, 26; [63-3] Ex. B; [64] ¶ 36.  In short, the circumstances of Plaintiff's detention do not rise to the level of those that the Supreme Court found "particularly egregious" in *Taylor.  Taylor*, 141 S. Ct. at 54.

Plaintiff does not cite any precedent that would otherwise aid his argument that his right was clearly established; thus, Defendants are entitled to qualified immunity from Plaintiff's Fourteenth Amendment claim.[13]

### ii.   Defendants are entitled to qualified immunity from Plaintiff's First Amendment retaliation claim.

The individual Defendants also assert qualified immunity as a defense to Plaintiff's First Amendment retaliation claim.  Again, a qualified immunity analysis requires two steps: "(1) whether the facts shown by the plaintiffs make out a violation of a constitutional or statutory right, and (2) whether the right was clearly established at the time of the defendant's alleged misconduct."  *Morgan*, 920 F.3d at 523 (quotation marks omitted) (quoting *Nord*, 757 F.3d at 738).  The second prong of this inquiry is easily established here because "[a] citizen's right to exercise First Amendment freedoms 'without facing retaliation from government officials is clearly established.'"  *Baribeau*, 596 F.3d at 481 (quoting *Kilpatrick v. King*, 449 F.3d 759, 767 (8th Cir. 2007)).  Therefore, the only question is whether a reasonable jury may find that the

---

[12] Plaintiff's allegation that Defendants intentionally neglected to charge the batteries of his electrolarynx does not, by itself, create a genuine dispute of material fact.  Defendants have submitted several affidavits and responses to Plaintiff's grievances attesting that Defendants attempted to keep the batteries for Plaintiff's device charged.  *See, e.g.*, Docs. [52-2] ¶ 23; Doc. [52-3] ¶ 21; [64] ¶¶ 38, 43-44; *see also* Doc. [69] at 6-7.  In response, Plaintiff has submitted only unsupported allegations that the device failed to work properly because of Defendants' failure to charge it.  Docs. [64] ¶ 33; [65-3] Ex. B ¶ 37 ("I had battery issues while at the Crawford County Jail because Defendants failed to charge the electrolarynx as I instructed them to.  The electrolarynx could have been fixed by charging it correctly or replacing the battery.").  Plaintiff's mere belief that Defendants' negligence or intentional wrongdoing was the source of the battery failing is not sufficient to create a genuine dispute of material fact.  *See Anderson*, 477 U.S. at 252.

[13] The Court does not take a position on whether Plaintiff has made a sufficient showing for a reasonable jury to find that he suffered a violation of a constitutional right, because the finding that such a jury could not find such a right to have been clearly established is sufficient for qualified immunity.  *See Morgan*, 920 F.3d at 523 (unless both prongs of the qualified immunity analysis are satisfied, a defendant is entitled to qualified immunity).

individual Defendants' failure to provide Plaintiff with his electrolarynx or other reasonable accommodations was in retaliation for Plaintiff's exercise of his First Amendment rights.

A First Amendment retaliation claim requires that a plaintiff demonstrate "a causal connection between a defendant's retaliatory animus and [the plaintiff's] subsequent injury." *Id.* (quoting *Osborne v. Grussing*, 477 F.3d 1002, 1005 (8th Cir. 2007)). While a plaintiff need not show that retaliation was a defendant's sole motive, retaliation must have been a "substantial factor." *Id.* (quotation marks omitted) (quoting *Kilpatrick*, 449 F.3d at 767). Additionally, a plaintiff must show that "the retaliatory motive was a 'but-for' cause of the [injury]." *Id.* (citing *Kilpatrick*, 499 F.3d at 767). Thus, to defeat Defendants' qualified immunity defense, Plaintiff must show that there is sufficient evidence in the record for a reasonable jury to conclude that retaliation was a "substantial factor" in, and a "but-for cause" of, Defendants' denials of his electrolarynx and suitable accommodations.

Plaintiff does argue that Defendants restricted the use of his electrolarynx and other accommodations because he complained about his treatment at the Detention Center. Doc. [63] at 18. As evidence, he cites his "belie[f]" that the denials were retaliatory. Doc. [65] ¶ 28. As evidence for that belief, he cites only his own declaration, which flatly states that "Defendants retaliated against [him]…," without any facts or circumstances to support that conclusion. Doc. [65-3] ¶ 33. Plaintiff cites no other evidence of retaliation.[14] Defendants counter that denial of access to the electrolarynx could not have been in retaliation for Plaintiff's grievances, because he was denied access to the electrolarynx *before* he began filing grievances. Doc. [53] at 12. Still, Plaintiff maintains—again citing no evidence except his own conclusory declaration—that the decisions to *keep* the device from him and not provide reasonable accommodations were retaliatory, speculating that that is why Defendants have failed to "give[] sufficient justification" for their failure to provide reasonable accommodations. Doc. [63] at 18.

Defendants contend that they have provided sufficient justification for their decision to deny access to the electrolarynx while Plaintiff was in the general population, and they deny that they failed to provide reasonable accommodations in lieu of the device. Doc. [53] at 7, 9. With

---

[14] In his Opposition, Plaintiff also claims that he "pled and stated" that Defendant Manley's alleged mockery was retaliatory, but he fails to cite his Complaint, and the Court found no such allegation in the cited paragraphs of his Statement of Undisputed Material Facts, citing Doc. [65] ¶¶ 8, 25, 26, 28, nor in his Complaint's First Amendment retaliation claim, *see* Doc. [27] ¶¶ 76-87. Therefore, the Court disregards that argument and admonishes counsel to exercise greater care in characterizing the record.

respect to Plaintiff's limitations on his access to his device, Defendants' proffered reason is compelling:  that the device itself could be used as a weapon or be disassembled and made into a weapon.  *Id.* at 4, 7; Doc. [64] ¶ 25.  In response to the allegation that their decision to deny him reasonable accommodations was retaliatory, Defendants point to evidence that Plaintiff successfully communicated with Detention Center staff, other inmates, and parties outside the Detention Center.  *See* Doc. [53] at 13-14.  Plaintiff rebuts none of that evidence and submits no evidence that he was prevented from communicating with other inmates or third parties about his objections to his circumstances.  He also offers no evidence, other than speculation, that Defendants' decisions were in retaliation for his speech.  The record indicates that Plaintiff was permitted to continue to file numerous grievances throughout his detention.  He alleges that Defendant intentionally misplaced his grievances but produces no evidence of that claim or of any other signs of retaliatory animus.  And even if he had, he would still have produced no evidence of a causal connection between such animus and his lack of access to the means of communication to which he believes he was entitled.

Viewing the record in the light most favorable to the Plaintiff, no reasonable jury could find that retaliation was a substantial factor in, or "but-for" cause of, Defendants' decisions regarding Plaintiff's electrolarynx or other accommodations.  *See Baribeau*, 596 F.3d at 481.  Plaintiff's putative "evidence" of retaliation is speculative and question-begging.  He has produced no actual evidence that any decision made by Defendants was retaliatory.  Meanwhile, Defendants have provided unrebutted evidence that Plaintiff was denied access to the electrolarynx before he filed any grievances; that there was a plausible non-retaliatory rationale for denying access to the device; and that Plaintiff communicated liberally throughout his confinement.  That record would not permit a reasonable jury to conclude that retaliatory animus was a "substantial factor" in Defendants' decisions.  *Baribeau*, 596 F.3d at 481 (quoting *Kilpatrick*, 449 F.3d at 767).  Therefore, Defendants are entitled to qualified immunity from Plaintiff's First Amendment retaliation claim.

## II.    Plaintiff's Claims Against Defendant Crawford County

### A.  The County is not entitled to summary judgment as to Plaintiff's ADA Claim.[15]

Title II of the ADA "prohibits a 'public entity' from discriminating against a 'qualified individual with a disability' on account of that individual's disability." *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 208 (1998) (citing 42 U.S.C. § 12131 *et seq.*).[16]  Title II's prohibition of discrimination applies to state prisons. *Elston v. Collins*, 2018 WL 3489591, at *2 (E.D. Mo. July 19, 2018) (citing *Randolph v. Rodgers*, 170 F.3d 850, 857 (8th Cir. 1998)). To establish a prima facie case under Title II, a Plaintiff must demonstrate:

(1) that he is a qualified individual with a disability;

(2) that he was excluded from participation in or denied the benefits of the prison's services, programs, or activities, or was otherwise subjected to discrimination by the prison; and

(3) that such exclusion, denial or benefits, or other discrimination was by reason of his disability.

*Rinehart v. Weitzell*, 964 F.3d 684, 688 (8th Cir. 2020) (quoting *Barbibeau*, 596 F.3d at 484).

Under Title II, public entities must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." *Whitall v. Munk*, 2021 WL 4442648, at *11 (N.D. Cal. Sept. 28, 2021) (quoting *Weinreich v. Los Angeles Cnty. Metro. Transp. Auth.*, 114 F.3d 976, 979 (9th Cir. 1997) (quoting 28 C.F.R. § 35.130(b)(7))).  Thus, "[o]nce a plaintiff has demonstrated a prima facie case, defendants may assert an affirmative defense that the requested accommodation would [have been] an undue burden." *Gard v. Dooley*, 2017 WL 782279, at *5 (D.S.D. Feb. 28, 2017) (citing *Mason v. Correctional Med. Servs., Inc.*, 559 F.3d 880, 886 (8th Cir. 2009)).

---

[15] For the reasons described in Part I.A, *supra*, Plaintiff was not a "prisoner" within the meaning of the PLRA; thus, his claim does not fail for failure to exhaust.  *See Nerness*, 401 F.3d at 876.

[16] There is no dispute as to whether the Crawford County Detention Center is a "public entity" within the meaning of the ADA.  *See Pennsylvania Dep't of Corr.*, 524 U.S. at 210  (holding that "[s]tate prisons fall squarely within the statutory definition of 'public entity,' which includes 'any department, agency, special purpose district or other instrumentality of a State of States or local government.'") (citing 42 U.S.C. § 12131(1)); *see also* 28 C.F.R. § 35.152 (noting that Title II expressly covers "jails, detention and correctional facilities" run by state and local governments).

At the outset, the Court is skeptical of Defendant's reliance on *Turner v. Safley*, 482 U.S. 78 (1987).  There, the Supreme Court articulated four factors for courts to consider in determining the reasonableness of prison regulations:  (1) whether there is a valid, rational connection between the prison regulation and the legitimate, neutral governmental interest used to justify it; (2) whether there exists alternative means for prisoners to exercise the constitutional right at issue; (3) the impact that would be caused by accommodation of the right on prison staff, other inmates, and allocation of prison resources; and (4) whether any alternative exists that would fully accommodate the prisoner's right at de minimis cost to valid penological interests. *Love v. Reed*, 216 F.3d 682, 690 (8th Cir. 2000) (citing *Turner*, 482 U.S. at 89).  While those factors are relevant, they are not dispositive of a regulation's reasonableness in the ADA context. Rather, courts in this circuit have held that the *Turner* factors inform whether a particular accommodation would have been an "undue burden" in the prison setting.  *See Maday v. Dooley*, 2019 WL 4935705, at *38 (D.S.D. Mar. 8, 2019) ("[T]he *Turner* analysis appears to be incorporated by the Eighth Circuit in the 'undue burden' affirmative defense."); *see also Gard*, 2017 WL 782279, at *5 (citing *Randolph*, 170 F.3d at 858) ("In the prison context, whether the requested accommodation poses a safety or security concern is relevant to the undue burden inquiry.").

Plaintiff satisfies the first prong of his prima facie case because there is a genuine dispute as to his disability status.  Under the ADA, an individual is considered disabled where he "suffer[s] from a physical or mental impairment that substantially limits one or more major life activities . . . ."  *Rinehart*, 964 F.3d at 688 (quotation marks omitted) (quoting 42 U.S.C. § 12012(1)).  Whether an individual meets this statutory criterion is a "fact-specific inquiry," but "Congress has instructed the courts to determine whether a limitation is substantial in light of its command to interpret disability broadly."  *Id.* (quoting *Oehmke v. Medtronic, Inc.*, 844 F.3d 748, 756 (8th Cir. 2016)).

Defendant questions Plaintiff's disability status on two points.  First, Defendant notes that Plaintiff must be able to speak without his electrolarynx to some extent because he describes conversations that he had with individuals when he did not have access to the device.  *See* Doc. [53] at 11 (citing Doc. [54] ¶¶ 44-46).  Second, Defendant contends that, even if he could not speak without the electrolarynx, Plaintiff found other means of communication such as mouthing words, using hand gestures and using pens and paper to write.  *See id.; see also id.* at 7-8 (citing

Doc. [54] ¶¶ 34, 36, 44-48).  Naturally, Plaintiff disagrees with that contention, and asserts that, even despite those mitigating efforts, he is still disabled within the statute.[17]

Construing Plaintiff's limitations broadly, as the ADA instructs courts to do, the Court finds that he is disabled within the meaning of the ADA.  Plaintiff clearly suffers from a physical limitation that affects a major life activity:  speaking.  The ADA states that speaking and communicating are major life activities.  42 U.S.C. § 12102(2)(A).  Moreover, the Court will not consider any ameliorative effects of mitigating measures, such as Plaintiff's ability to communicate by mouthing words, using hand gestures, or writing, in determining whether he is disabled.  Defendant's assertion that Plaintiff utilized other means of communication may be relevant to other elements or claims—namely, whether certain limitations or accommodations were reasonable—but it does not affect whether Plaintiff is disabled under § 12102.

Next, the Court presumes that the second and third elements of Plaintiff's prima facie case are met here, as neither party addresses those elements in their briefing.  The second element—that Plaintiff was excluded from or denied benefits of the Detention Center or was otherwise discriminated against—is met because Plaintiff alleges that he was not able to sufficiently communicate during his time at the Detention Center.  And the third element—that the discrimination was by reason of his disability—is also met because Plaintiff's inability to communicate without access to his device or other accommodations resulted from his inability to speak.  Thus, the Court finds that Plaintiff has satisfied the prima facie case for his Title II claim against Defendant Crawford County.

Once a plaintiff has satisfied the elements of his prima facie case, the burden switches to the defendant to show that its accommodation was reasonable and/or that the plaintiff's requested accommodation would have been an undue burden.  *See Cade v. Williams*, 2014 WL 5529743, at *2 (E.D. Ark. Oct. 31, 2014) ("[T]he ADA requires prisons to provide disabled inmates with 'reasonable accommodations," but not necessarily the specific accommodation sought by the prisoner.") (quoting *Mason*, 559 F.3d at 886).  Here, Defendant has not shown that a reasonable factfinder could not find that Plaintiff was denied a reasonable accommodation.  Defendant appears to set forth two accommodations that it alleges were reasonable

---

[17] Again, the Court notes that Plaintiff attempts to rely on the affidavit of Dr. Allphin to prove his disability status.  Doc. [63] at 13.  For the reasons discussed in note 1, *supra*, the Court will not consider Dr. Allphin's testimony in determining this Motion for Summary Judgment.

accommodations as a matter of law:  (1) Plaintiff being given the choice of being placed in administrative segregation with the device, and (2) Plaintiff having alternative methods of communication.

First, Defendant contends that Plaintiff's choice between administrative segregation with his device and the general population with "limited access to the device" was reasonable.  Doc. [53] at 7.  Whereas Plaintiff categorizes the accommodation as an all-or-nothing choice, Defendant emphasizes that Plaintiff was not denied the electrolarynx at all times and that he had access to it during certain activities including visitations, medical visits, and court appearances. *See id.* at 7-8.  Defendants also emphasize that Plaintiff's possession of the electrolarynx created the risk that other inmates would disassemble it and fashion weapons from it, causing a serious security concern for the Detention Center.  *Id.* at 7.  Thus, a system in which Plaintiff could use the electrolarynx during some activities while maintaining security in the general population was reasonable, according to Defendant.[18]  Plaintiff counters that the choice was unreasonable pursuant to Section 35.152 of the ADA Regulations, which states that a jail "shall not place inmates or detainees with disabilities in inappropriate security classifications because no accessible cells or beds are available."  28 C.F.R. § 35.152(b)(2)(i).

Undoubtedly there are unique risks associated with prison security and safety, but the ADA requires that reasonable accommodations be provided where security regulations affect a disabled individual's rights under the statute.  It is not sufficient, therefore, to merely state that the limitation was reasonable because the electrolarynx implicated legitimate security concerns.  Defendant must also show that the alternative accommodation was reasonable.  Defendant has not carried its burden of showing that Plaintiff's choice between administrative segregation and the general population was reasonable as a matter of law.  On the record before the Court, a reasonable factfinder could conclude that requiring Plaintiff to choose between not having regular access to his electrolarynx and entering administrative segregation (i.e., solitary confinement) was unreasonable.

---

[18] Defendant relies on *Baribeau*, but that reliance is misplaced.  In *Baribeau*, the Eighth Circuit did not consider whether the proffered accommodation was reasonable because it determined that the plaintiff was "not denied access to any of the benefits of the jail's services, programs, or activities during his less than forty-eight hours in custody."  *Baribeau*, 596 F.3d at 485.

With respect to alternative methods of communication, Defendant alleges that Plaintiff admitted that writing materials would be a reasonable accommodation in lieu of his electrolarynx. Doc. [69] at 4 (citing Doc. [63] at 14-15). Defendant also alleges that it provided Plaintiff with those materials. *Id.* For instance, Defendant points to evidence that Plaintiff had access to writing materials and used them frequently. *Id.* at 5 (citing Doc. [54] ¶¶ 30-33, 35-43, 48). Defendant further notes that Plaintiff purchased a writing tablet, ink pens, and stamps, suggesting that he had access to other communication devices when he needed them. Doc. [54] ¶ 36. Plaintiff counters that Defendant did not provide him with free pads of paper or a white board, which would have been a more reasonable accommodation. Doc. [63] at 15.

Defendant has failed to meet its burden of showing that, as a matter of law, the proffered accommodation was reasonable. While Defendant has shown that it provided Plaintiff with writing materials, it evidently did so only with respect to the grievance procedure. Doc. [54] ¶¶ 30-33, 35-43. Defendant does not argue that it provided pens, paper, or other communication alternatives to Plaintiff during other essential activities, including meetings with the Detention Center's nurse, visitations with family, or interactions with other inmates. And even if Plaintiff later bought a writing tablet and pens, a reasonable jury could still find that it was unreasonable for the Detention Center to not provide those materials to Plaintiff. Therefore, summary judgment as to Plaintiff's ADA claim against Crawford County is not appropriate.

## B. Defendant Crawford County fails to meet the initial burden for summary judgment as to Plaintiff's § 1983 claims.

In his Amended Complaint, Plaintiff alleges that Defendant Crawford County violated his rights pursuant to § 1983 by: (1) acting with deliberate indifference to his serious medical needs in violation of the Fourteenth Amendment and (2) retaliating against him in violation of his First Amendment rights. Doc. [27] at 10-12. A county may be liable under § 1983 only where the constitutional violation was "committed pursuant to an official custom, policy, or practice" or was "so pervasive among non-policymaking employees as to constitute a custom or usage with the force of law." *Agnew v. St. Louis Cnty.*, 504 F. Supp. 3d 989, 1003 (E.D. Mo. 2020) (cleaned up) (quoting *Granda v. City of St. Louis*, 472 F.3d 565, 568 (8th Cir. 2007)). Defendant Crawford County moves for judgment as a matter of law as to Plaintiff's constitutional claims on the grounds that Plaintiff has produced no evidence that the allegedly offensive conduct was the result of a policy or custom of the Detention Center. Doc. [52] ¶ 10 (citing *Monell v. Dep't of*

*Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978); *Doe v. Washington County*, 150 F.3d 920 (8th Cir. 1998)).

On summary judgment, the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323.  Although Defendant's Motion avers that "there is no evidence" that Plaintiff's claims are "the result of a policy or custom of the Crawford County Detention Center," Doc. [52] ¶ 10, its briefing provides no evidence or argument of an absence of any genuine issue of material fact on that question.  Therefore, Defendant has not met its initial burden for summary judgment as to Plaintiff's constitutional claims.

CONCLUSION

For the reasons discussed herein, Plaintiff cannot maintain his ADA or § 1983 claims against Defendants Driskell, Manley, Bouse, "Monty," and "K."  Therefore, summary judgment is appropriate as to those claims.  Plaintiff has shown a genuine dispute of material fact as to whether Defendant Crawford County denied him reasonable accommodations at the Detention Center, however, and the County has failed to show an absence of material fact as to Plaintiff's § 1983 claims.  *Celotex Corp.*, 477 U.S. at 323.  As such, Defendant Crawford County is not entitled to judgment as a matter of law.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (Doc. [52]) is **GRANTED IN PART** and **DENIED IN PART**.  The Motion is **GRANTED** as to Counts I, II, and III of Plaintiff's Second Amended Complaint against Defendants Zackary Driskell, Diane Manley, Derek Bouse, "Monty," and "K."  The Motion is **DENIED** as to Counts I, II, and II of Plaintiff's Second Amended Complaint against Defendant Crawford County.

**IT IS FURTHER ORDERED** that this case will be set for trial by separate Order.

A separate Judgment shall accompany this Memorandum and Order.

Dated this 18th day of February, 2022.

SARAH E. PITLYK
UNITED STATES DISTRICT JUDGE